IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
December 5, 2000 Session

## STATE OF TENNESSEE v. JOHNIE JEFFERSON and LARRY JOHNSON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 98-06749     Joseph B. Dailey, Judge**

---

**No. W1999-00747-CCA-R3-CD  - Filed October 12, 2001**
**No. W2000-01970-CCA-R3-CO - Filed October 12, 2001**

---

The Defendants, Johnie Jefferson and Larry Johnson, were found guilty by a Shelby County jury of first degree murder in No. W1999-00747-CCA-R3-CD.  Both Defendants received life sentences with the possibility of parole.  The Defendants now appeal, arguing (1) that there was insufficient evidence to convict them of first degree premeditated murder, (2) that the trial court erred in admitting into evidence a demonstrative exhibit showing the organizational structure of the Gangster's Disciples, (3) that the trial court erred in allowing the jury to take an exhibit showing the organizational structure of the Gangster's Disciples into the jury room during deliberations, (4) that the trial court erred in admitting for impeachment purposes Jefferson's prior convictions, (5) that the trial court erred in denying Jefferson's motion to sever, and (6) that the trial court erred in allowing into evidence the contents of Johnson's car.  In addition, Defendant Jefferson sought relief in a petition for a *writ of error coram nobis*, which was denied by the trial court.  Jefferson's appeal from the denial of this petition came before this court in a separate appeal, No. W2000-01970-CCA-R3-CO; however, both cases were consolidated for appellate purposes. We find no reversible error with regard to any of the issues raised; thus, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOE G. RILEY and JOHN EVERETT WILLIAMS, JJ., joined.

John F. Canale, III, Memphis, Tennessee, for the Appellant, Johnie Jefferson; and Harry E. Sayle, III, Memphis, Tennessee, for the Appellant, Larry Johnson.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; Kenneth R. Roach, Assistant District Attorney General; and Terrell L. Harris, Assistant District Attorney General, for the Appellee, State of Tennessee.

# OPINION
## I. FACTS

Raniko Lindsey Bonner testified that in November 1997, she was living with her children and Marlo Richardson at Hurt Village Apartments. Bonner testified that at the time, she knew a man that she referred to as "MacLarry," whom she identified in court as Larry Johnson. Bonner testified that she was also associated with a man that she referred to as "J-Rock," whom she identified in court as Johnie Jefferson. According to Bonner, both men were members of a gang called the Gangster's Disciples. At that time, Bonner testified that she was dating a man named Tony Phillips (a.k.a. "T-Money"). According to Bonner, Phillips was the leader of the Gangster's Disciples, although Bonner claimed she did not know that at the time of the offense.

Bonner testified that on November 3, 1997, she was at home with her mother, Phillips, Jefferson, Richardson, and Richardson's boyfriend, Dushack. Bonner testified that there were knocks at her front and back doors. Bonner opened the back door and saw Larry Johnson and Marcus Glass (a.k.a. "Sporty"). Bonner then opened the front door to find Robert Walker. Bonner testified that Walker gave her some alcohol and asked her to fix him a sandwich. After Bonner gave Walker the sandwich, Glass called Jefferson away from the table where he was sitting. Jefferson went to the back of the apartment and spoke to Johnson and Glass.

Bonner testified that after the conversation, she asked Johnson to take her to her aunt's house. Johnson said that he couldn't because "he had some business to take care of." Bonner went upstairs to straighten up her room, and when she came back, Jefferson, Johnson and Glass had all gone.

Bonner testified that she saw Johnson the next night when he and Glass returned to Bonner's apartment. Bonner testified that the Defendants told her that "one of the folks was found dead in the park." Bonner testified that "folks" refers to members of the Gangster's Disciples.

Marcus Rydell Glass (a.k.a. "Sporty") testified that he was charged in this case with facilitation of the murder in the first degree of Kelvert Hailey, the victim in this case. Glass testified that he had been a member of the Gangster's Disciples since 1989. Glass testified that there is an organizational structure to the gang in which he stated that he held the position of "chief of security." According to Glass, there are certain rules in the gang, and those members that do not follow the rules are punished. As "chief of security" for the city, Glass worked under Tony Phillips, who is the "overseer." Robert Walker, Johnie Jefferson and Larry Johnson were also "chief[s] of security." One of the duties of a "chief of security" is "handling violations."

Glass testified that he knew the victim as a member of the Gangster's Disciples but did not know if the victim held a position within the organization. According to Glass, the victim had violated one of the rules of the Gangster's Disciples. Glass testified that on November 3, 1997, Larry Johnson called him and asked him to come to the home of Johnson's girlfriend. Johnson told Glass that the victim was there. At some point after Glass arrived, the victim left. Glass and Johnson left and found the victim near where Johnson's car had been parked. The victim asked if

he could get a ride to a club called Ebony Lace. According to Glass, the victim did not know that he was in trouble.

Johnson, Glass and the victim left the apartment complex and went to Burger King. At the restaurant, Johnson approached Glass and told him that "instead of dropping [the victim] off we're going to go get a bag of weed so we can smoke it." The three men then went to an apartment complex called Hurt Village. Once there, Glass and Johnson went into an apartment that belonged to Tony Phillips' girlfriend, Raniko Bonner (a.k.a. "Nikki"). Jefferson, Phillips, and Walker (a.k.a. "McRob") were all there. Jefferson and Walker told Phillips that the victim was in the car. Glass testified that he was carrying a .380 Smith and Wesson gun; that Johnson was carrying a .357 Smith and Wesson revolver; and that Jefferson was carrying a nine-millimeter Smith and Wesson gun. According to Glass, all of the guns were provided by Tony Phillips.

Johnson, Jefferson and Glass left the apartment. While standing outside, Johnson explained to Jefferson that he had "set[] . . . [the victim] up" by telling the victim that they were going to get some marijuana. The three men then got in Johnson's car along with the victim. With Johnson driving, the men went to Levi Road in Whitehaven. When asked why they went to Levi Road, Glass testified that he guessed it was "to kill [the victim]." Johnson parked the car on the side of Levi Road. Jefferson then got out of the car and said that he had to urinate; however, he instead opened the back door and pulled the victim out of the car at gunpoint. Glass testified that the victim told him to tell them that he was begging for his life. Johnson tried to help Jefferson pull the victim out of the car, and at that point, the victim tried to run.

Glass testified that when the victim started to run, Johnson shot him twice in the back. The victim tried to run to the left into the woods, but he fell. Jefferson took the gun from Johnson and shot the victim four times while he was lying on the ground. Jefferson then got his own gun and shot the victim twice more. Jefferson and Johnson got back in the car, and Jefferson said that the victim was "broke." Glass remained in the car during the incident. Glass testified that he was in trouble with the organization for not participating in the murder.

Glass testified that he went to Tony Phillips' house the next day to give him back his gun. Phillips wanted the guns back so that he could "drill them out." According to Glass, Phillips wanted to drill the grooves out of the gun to change its ballistics. Johnson and Jefferson were both at Phillips' house, having the same thing done to their guns. Glass identified in court the guns used to kill the victim as the ones that Jefferson and Johnson used on November 3, 1997.

After the murder, Glass left town and went to Chicago. When Glass called his mother, she told him that the Fugitive Squad was looking for him. Glass called Phillips. According to Glass, Phillips told him "what he was going to do to [Glass]" if he went to the authorities. After a week in Chicago, Glass went back to Memphis where he again talked to Phillips. Glass testified that Phillips threatened him and his family.

Robert Walker testified that he was raised in Detroit and that while there, he became a member of the Black Gangster's Disciples. Walker testified that the Black Gangster's Disciples was different from the Gangster's Disciples in Memphis. When Walker moved to Memphis in 1996, he joined the Gangster's Disciples. Walker testified that he eventually held the position of "chief security" of the city and reported directly to the "overseer," Tony Phillips. Walker testified that Jefferson and Johnson were also "chief[s] of security."

Walker, with the aid of a chart, testified regarding the organizational structure of the Gangster's Disciples. According to Walker, Phillips was the "overseer" of the organization in Memphis. Jefferson was a "chief of security" in charge of enforcement, and Johnson and Glass were Jefferson's two assistants. Walker testified that he was also a "chief of security" in charge of growth and development. Walker explained that as part of his job within the organization, he investigated and punished violations. Walker testified that he and Jefferson frequently met at Phillip's residence to discuss gang business.

Regarding Jefferson's position as an "enforcer," Walker testified that if Phillips "tell[s] him to go out there and kill somebody, he'll do it." According to Walker, there are some violations within the organization that necessarily result in death. One of those violations is "1919," which is when a gang member gives a statement to police. Walker said that he was aware that the victim was in trouble with the organization because he had broken "1919."

Walker testified that on November 3, 1997, he, Phillips, Jefferson, and Richardson were all at the home of Raniko Bonner, Walker's sister. Johnson and Glass arrived later in Johnson's car. Walker testified that Johnson was carrying a .357 revolver and Glass was carrying a ".380." Walker testified that Johnson talked to Phillips and told him that they had the victim in the car. According to Walker, Phillips told Jefferson to "take care of his business" and winked his right eye. Walker testified that the winking of the right eye signified that Jefferson was supposed to "put [the victim] to sleep." Jefferson then left with Glass and Johnson. Walker testified that he walked outside with them, and Johnson told him that "he was fixing to go kill dude."

Marlo Richardson (a.k.a. "Loony Toon") testified that she talked to Marcus Glass after the death of the victim and that Glass told her that "he didn't mean it to happen that way." According to Richardson, Glass said that he shot the victim. Richardson testified that he lived with Raniko Bonner at Hurt Village Apartments. Richardson testified that she remembered the day that Phillips, Walker, Jefferson, and Glass were all at Bonner's apartment. Richardson testified that Johnson was not there. Richardson testified that Glass, Jefferson, and Walker all left. Although Richardson testified at trial that Johnson was not at Bonner's place on November 4, 1997, she admitted in her statement that Phillips, Walker, Johnson, Glass and Jefferson were all there, and she recalled that they were discussing that someone had been killed.

Alvin Odom testified that on November 4, 1997, he was riding in a car with his wife. The couple had just dropped off their children at elementary school and were traveling on Levi Road taking their daughter to day care. While on Levi Road Odom saw a man, later identified as the

victim, Kelvert Hailey, lying in a ditch. He first thought that the man had just passed out and asked his wife if they should try to wake him up. His wife agreed, and they turned the car around and headed back towards where they had seen the man. After they pulled up beside the man, Odom began to get out of his car when his wife started "shaking and crying." She said that she saw holes in the man's head. The Odoms immediately went back to the elementary school where they had dropped off their children and told a teacher what they had seen. The teacher then called the police, and the Odoms returned to where they had found the body and waited for the police.

Byron Braxton of the Memphis Police Department responded to the call and arrived on the scene around 7:25 a.m. or 7:30 a.m. Braxton spoke to the Odoms and observed the crime scene. According to Braxton, the victim was "a male black wearing white tennis shoes, green jeans and a red and white jacket, laying in a semi fetal position, face down in a ditch on the north side of Levi." Braxton said that he observed a large hole in the back of the victim's head. Braxton testified that the area in which the victim was found was "relatively secluded," with no houses in the immediate vicinity and only a couple of businesses nearby. In addition to the body, Braxton observed two handgun shell casings near the body. Braxton also noticed "a scuff or some type of skid mark in the dirt, in line with the body in the ditch." A tooth was also found at the crime scene.

Officer Danny James, a member of the Crime Scene Unit of the Memphis Police Department, testified that he collected evidence at the crime scene. James testified that the victim's shoe print was on the pavement near the ditch where he was found. According to James, there were "little burs [sic] on [the victim's] lower pants and shoes and socks," which he believed someone would get if they walked or ran through weeds. Officer James took photographs of the victim's body, including a photograph of the victim's hand, which was clinched in a fist. Officer James testified that he did not find any physical evidence such as fingerprints, hair, or clothing fibers that belonged to the Defendants. Officer Shan Allen Tracy of the Memphis Police Department testified that a bullet was found in the dirt underneath where the victim's head had been.

Sergeant R. D. Roleson of the Memphis Police Department testified that he was assigned to locate the witnesses in this case. Larry Johnson was one of the individuals whom Roleson was assigned to locate. After talking to a witness named Melissa Looney at the homicide office, Sergeant Roleson requested that Looney call Larry Johnson's beeper. The number from which Johnson returned the call was traced, and the police then went to that location. A consent to search form for the house was obtained, but Johnson was not there. While there, Sergeant Roleson learned that Johnson's car was in the parking lot. Roleson testified that he had the car towed to the crime scene building to be processed. Roleson testified that he had the car towed because based on his investigation, it was likely that the victim was last seen in Johnson's vehicle.

A warrant was later obtained to search Johnson's vehicle. The warrant was based on the affidavit of Sergeant O. W. Stewart of the Memphis Police Department. The affidavit states, in pertinent part:

> [A]ffiant has received information relating to the shooting death of Kelvert Hailey
> from a reliable witness who advised that Larry Johnson and Marcus Glass were

responsible for the death of Kelvert Hailey. This witness did see Marcus Glass armed with a black automatic handgun on Thursday, November 6, 1997 two days after the body was recovered on Tuesday, November 4, 1997 at 7:32 a.m. This reliable witness gave information that on Friday, October 31, 1997 this witness saw Larry Johnson in possession of a chrome revolver. The victim had been shot six times in the back and head and only two spent casings from a 9mm automatic were found on the scene of the Homicide, indicating that another weapon was involved. This witness also indicated that Marcus Glass and Larry Johnson were together on Monday night, November 3, 1997, until the early morning hours of Tuesday, November 4, 1997, were occupying Larry Johnson's 1984 Buick Lasabre, VIN# 1G4AN69Y8EX422903 and were with the victim just prior to the victim's death.

Officer Barry G. Lane of the Memphis Police Department, a member of the Crime Scene Unit, processed Larry Johnson's car. A revolver was found in its case in the trunk of the car. Lane also confiscated six live rounds from the car and a pawn shop ticket "in regards to the nine-millimeter pistol." Officer Lane obtained fingerprints from a photograph that was found in the vehicle. He also obtained fingerprints from the rearview mirror and a cologne bottle found inside. James Hill, a latent print examiner with the Memphis Police Department, testified that the fingerprints on the rearview mirror belonged to Larry Johnson and that the fingerprints on the photograph belonged to Tony Phillips.

Ronnie McWilliams testified that he worked as an investigator on the anti-gang team in the Attorney General's office. McWilliams testified that on October 6, 1997, he interviewed the victim regarding a robbery investigation. McWilliams talked to the victim "to gain knowledge of gangs in his area and what he knew about it." McWilliams testified that the victim indicated that he was a member of the Gangster's Disciples, but he did not discuss the structure of the organization. McWilliams also testified that he participated in the execution of an Federal Bureau of Investigation (F.B.I.) search warrant on Tony Phillip's residence. McWilliams testified that he found a drill and drill bits in the residence.

Robert Daniel Royce, a forensic scientist specializing in firearms identification with the Tennessee Bureau of Investigation (T.B.I.), testified that the bullet found in the ground beneath the victim's head matched the nine millimeter pistol that was entered into evidence. Royce also testified that the interior of the Smith and Wesson .357 Magnum revolver had been drilled out. Royce testified that he believed two weapons were used to kill the victim: a .357 revolver and nine millimeter pistol.

Defendant Jefferson testified that he was twenty-two years old and lived with his parents. Jefferson testified that he did not know about the victim's death until he was arrested on November 5, 1997. Jefferson stated that he had never seen or heard of the victim before November 5, 1997. When questioned about where he was on the day of the murder, Jefferson testified that he did not know. Jefferson also testified that he did not know Larry Johnson and had never heard of him before November 5, 1997.

Jefferson testified that he had been a member of the Gangster's Disciples since 1994, when he was seventeen years old. Jefferson testified that he did not hold a position within the organization. Jefferson testified that in 1995 he was charged with robbery and gave a statement against his co-defendant, also a member of the Gangster's Disciples. According to Jefferson, Glass contacted Jefferson and told him that "since [he] gave a statement, at that time [he] was told to take that charge for the robbery and let the co-defendant loose." Jefferson testified that he did not believe he had a choice and that he had to take the charge. Jefferson testified that when he made it known in 1995 that he wanted out of the organization, Glass told him that he had to "suffer the consequences." Jefferson testified that the consequences were death or being put into a situation to "get caught up." Jefferson testified that he did not know what positions Glass and Phillips held in the Gangster's Disciples, but he knew they "ranked high."

Defendant Larry Johnson testified that he played the organ at Al Green's church in Memphis. Johnson testified that he often visited his cousin Ira Farris, who lived with Tony Phillips and Totti Brown. Johnson testified that Phillips also cut his hair sometimes. Johnson testified that he did not know that Phillips was a member of the Gangster's Disciples. Johnson testified that met Marcus Glass at Phillips' residence. Johnson stated that he sometimes transported Glass to the Hurt Village apartment complex because both of their girlfriends lived there. Johnson testified that he also did not know that Glass was a member of the Gangster's Disciples.

Johnson testified that he met Robert Walker for the first time at the preliminary hearing. Johnson testified that he had met Raniko Bonner when he took Phillips to her apartment. Johnson further testified that he did not know Jefferson before he was arrested, and he maintained that he had only met the victim once. Johnson testified that he did not go to Bonner's apartment during the day on November 3, 1997, but he admitted that he did go there that night.

Johnson testified that on November 4, 1997, he saw Glass walking, so he gave him a ride. Glass asked if he could put a bag in the trunk. Johnson said that he eventually dropped Glass off at Kingsgate Apartments. Johnson testified that his car was having some problems, so on November 4, 1997, he took the car to Phillips' apartment complex because Phillips and Farris knew some mechanics that would work inexpensively.

When Johnson returned to work on Saturday, the car still was not fixed. The mechanic told Johnson that he needed a wrench, so Johnson testified that he looked in his trunk to find one. When Johnson looked in the trunk, he saw that Glass' bag was still there. Johnson testified that he went through the bag and found a gun. Johnson testified that he went inside and told Phillips that Glass left a gun in his car. According to Johnson, Phillips told him that he couldn't bring the gun inside, so Johnson put the gun back in the trunk of his car.

Johnson testified that he was driving his car on the night of November 3, 1997. Johnson testified that he was with his brother on the night of the murder; however, his brother failed to testify as to Johnson's whereabouts on that night. Johnson testified that he was at Phillips' residence when

the police beeped him. Johnson stated that nobody answered when he called the number on his beeper. Johnson recalled that after attempting to return the call, he left.

Totti Brown, Tony Phillips' roommate at the time of the offense, testified that Johnson and Jefferson frequently came to her apartment to see Phillips. Brown testified that on November 9, 1997, she was at home with Phillips and Johnson. At some point during the day Johnson received a page. Brown recalled that Johnson called the number on the pager, but nobody answered. According to Brown, Johnson then told Phillips that he was going to leave because "he didn't know what was going on." Brown testified that Phillips left about thirty minutes later. Soon thereafter, the Memphis Police Department arrived looking for Johnson.

Debra Falasco testified that she works for the Title Division of the Shelby County Clerk's Office. As part of her job, Falasco is custodian of vehicle ownership records in Shelby County. Falasco testified that on October 21, 1997, Larry Johnson applied for a title on a blue 1984 Buick LeSabre. The license plate number in her records matched the one on Larry Johnson's car.

Dr. Wendy Gunther, Medical Examiner for Shelby County, performed the autopsy on the victim. Dr. Gunther testified that the cause of death was gunshot wounds to the victim's head, neck, and torso. Dr. Gunther testified that probably six or seven bullets went through the victim's body. According to Dr. Gunther, two bullets went through the victim's head.

## II. ANALYSIS

### A. *Sufficiency of the Evidence*

The Defendants argue that insufficient evidence was presented at trial to convict them of first degree premeditated murder. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985); Tenn. R. App. P. 13(e). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 2000).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956); State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant

removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

Sufficient evidence was presented at trial for a rational jury to find beyond a reasonable doubt that the Defendants were guilty of first degree murder. First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1). Once a homicide has been established, it is presumed to be second degree murder, and the State has the burden of proving premeditation to raise the offense to first degree murder. State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999) (citing State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998)). Premeditation is defined as "an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d).

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. Premeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct. State v. Brown, 836 S.W.2d 530, 540-41 (Tenn. 1992).

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Rosa, 996 S.W.2d 833, 837 (Tenn. 1999) (citing Brown, 836 S.W.2d at 539). The use of a deadly weapon upon an unarmed victim and declarations by the defendant of his intent to kill the victim may support the existence of premeditation. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997).

Viewing the evidence in the light most favorable to the State, a jury could have reasonably found that the Defendants killed the victim after the exercise of reflection and judgment. See Tenn. Code Ann. § 39-13-202(a)(1), (d). Marcus Glass testified that he witnessed the two Defendants shoot and kill the victim. Glass testified that he was a member of the Gangster's Disciples, along with the victim and the two Defendants. According to Glass, the victim had violated one of the rules of the organization, and the punishment was death. Glass testified that he, Johnson, and Jefferson took the victim to a deserted area on the night of November 3, 1997 and that Johnson and Jefferson shot the victim as he tried to run away. Glass stated that he witnessed the entire incident. Glass further testified that Johnson shot the victim twice in the back with a .357 revolver, Jefferson shot the victim four times with the same gun, and then Jefferson got his nine-millimeter pistol and shot the victim twice more.

Jefferson and Johnson argue that there was not sufficient corroboration of Marcus Glass' testimony to support the verdict. In Tennessee, a criminal defendant cannot be convicted solely on the uncorroborated testimony of an accomplice. State v. Allen, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). Whether the testimony of an accomplice has been sufficiently corroborated is a question for the jury. State v. Heflin, 15 S.W.3d 519, 524 (Tenn. Crim. App. 1999). However, corroborating

evidence need not be sufficient in and of itself to support a conviction, but it must fairly connect the Defendant with the commission of the crime. State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992).

There was sufficient corroboration of Glass' testimony to convict the Defendants of premeditated first degree murder. Raniko Bonner testified that the Defendants were at her house on November 3, 1997 and that they left with Glass because Johnson told her that they "had some business to take care of."

In addition, Robert Walker, also a member of the Gangster's Disciples, testified that he was present at Raniko Bonner's house on November 3, 1997 where he saw both Defendants carrying guns. Walker testified that Johnson told Tony Phillips that he had the victim in the car. According to Walker, Phillips told Jefferson to "take care of his business" and winked his right eye, which meant that Jefferson was supposed to "put [the victim] to sleep." Walker testified that Jefferson, Johnson, and Glass all left together. Walker stated that he walked outside with them, whereupon Johnson told him that "he was fixing to go kill dude."

Finally, testimony by the officers investigating the crime and the medical examiner corroborated Glass' testimony. Dr. Wendy Gunther's testimony regarding the victim's gunshot wounds matched Glass' description of how and where the victim was shot. We find this issue to be without merit.

## B. *Admission of Gangster's Disciples Chart*

Both Defendants argue that the trial court erred in admitting into evidence the organizational chart of the Gangster's Disciples. Specifically, the Defendants argue that the demonstrative exhibit was highly prejudicial and not relevant to the issue of guilt. We disagree.

The admissibility of evidence is a matter within the discretion of the trial court, whose decision will not be reversed on appeal absent a showing of abuse of discretion. State v. Edison, 9 S.W.3d 75, 77 (Tenn. 1999). With certain exceptions, all relevant evidence is generally admissible. Tenn. R. Evid. 402. Relevant evidence is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. The determination of relevancy is within the discretion of the trial court and will not be overturned absent an abuse of discretion. State v. Williamson, 919 S.W.2d 69, 78-79 (Tenn. Crim. App. 1995). Relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Tenn. R. Evid. 403. Furthermore, the admission of demonstrative evidence is within the discretion of the trial judge. State v. West, 767 S.W.2d 387, 402 (Tenn. 1989). Such a ruling will not be disturbed on review absent a clear demonstration of an abuse of discretion. State v. Delk, 692 S.W.2d 431, 438 (Tenn. Crim. App. 1985).

In this case, the State argued that the victim was killed as the result of violating one of the rules of the Gangster's Disciples. According to testimony at trial, the victim had given a statement to the police regarding another crime by the Gangster's Disciples. The State argued that high-ranking members of the organization ordered the victim's death because of this violation. As such, the chart, which was introduced as an exhibit, was used to show the hierarchy of the Gangster's Disciples. We conclude that the chart was relevant, and we conclude that its probative value was not outweighed by its prejudicial effect. We therefore conclude that the trial court did not abuse its discretion in admitting the chart.

In addition, Jefferson argues that even if the chart were properly admitted, the trial court erred in allowing the exhibit to be sent to the jury room over the objection of defense counsel and when the parties failed to consent. However, Rule 30.1 of the Tennessee Rules of Criminal Procedure states:

> Upon retiring to consider its verdict the jury shall take to the jury room all exhibits and writings which have been received in evidence, except depositions, for their examination during deliberations, unless the court, for good cause, determines that an exhibit should not be taken into the jury room.

Jefferson's argument is without merit.

## C. *Admission of Jefferson's Prior Convictions*

Jefferson argues that the trial court erred in admitting for impeachment purposes his prior convictions for robbery and theft. Specifically, Jefferson argues that the admission of this evidence violated Rule 609(3) of the Tennessee Rules of Evidence because its prejudicial effect outweighed its probative value on credibility. We disagree.

The following requirements must be met before the credibility of a witness may be impeached with evidence of prior convictions: (1) "The witness must be asked about the conviction on cross-examination," Tenn. R. Evidence 609(a)(1); (2) "[t]he crime must be punishable by death or imprisonment in excess of one year," Tenn. R. Evid. 609(a)(2), or "the crime must have involved dishonesty or false statement," id.; and (3) "[i]f the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of the impeaching conviction before trial, and the court upon request must determine that the conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues." Tenn. R. Evid. 609(a)(3). In addition, when the current prosecution is commenced more than ten years after the date of release of the prior conviction sought to be used to impeach the witness, the prior conviction may not be used to impeach the witness unless the accused is given sufficient notice of the prosecution's intent to use such evidence, and the court determines that the probative value of the evidence substantially outweighs any prejudicial effect. Tenn. R. Evid. 609(b).

In determining whether the probative value of a prior conviction on the issue of credibility outweighs its unfair prejudicial effect on the substantive issues, a trial court should assess the similarity between the pending prosecution and the underlying impeaching conviction, as well as the

relevance of the impeaching conviction with respect to credibility. State v. Farmer, 841 S.W.2d 837, 839 (Tenn. Crim. App. 1992). The trial court should state its reasons for finding that the probative value of the prior conviction on the issue of credibility outweighs any prejudicial effect on the substantive evidence. See Long v. State, 607 S.W.2d 482, 485 (Tenn. Crim. App. 1980). The trial court's decision to allow the prior convictions under Rule 609 will not be reversed on appeal unless the trial court abused its discretion. State v. Blanton, 926 S.W.2d 953, 960 (Tenn. Crim. App. 1996).

Jefferson argues that the trial court erred in admitting into evidence the Defendant's prior convictions for robbery and theft because the convictions' probative value did not outweigh its prejudicial effect. The trial court weighed the probative value of the prior convictions against its prejudicial effect and concluded that the probative value outweighed any prejudicial effect. Jefferson has failed to show how the prejudicial effect outweighed the probative value. On this issue, we find no abuse of discretion by the trial court.

D. *Jefferson's Motion to Sever*

Jefferson argues that the trial court erred in denying his motion to sever his trial from that of his co-Defendant, Larry Johnson. Specifically, Jefferson argues that evidence introduced regarding his co-Defendant was unfairly prejudicial to him. This issue is without merit.

Severance is a matter addressed to the sound discretion of the trial court. State v. Maddox, 957 S.W.2d 547, 556 (Tenn. Crim. App. 1997). Absent an affirmative showing of prejudice, the trial court's exercise of that discretion will not be reversed. State v. Ensley, 956 S.W.2d 502, 508 (Tenn. Crim. App. 1996). The trial court, on motion by the defendant, shall grant a severance of defendants if "it is deemed appropriate to promote a fair determination of the guilt or innocence of one or more defendants." Tenn. R. Crim. P. 14(c)(2)(i).

The trial court properly denied Jefferson's motion to sever his case from that of his co-Defendant, Larry Johnson. Jefferson and Johnson were named in the same indictment for the murder of Kelvert Hailey. Although Jefferson argues that he was prejudiced by being associated with Johnson, such an association would have been brought out even if there had been separate trials. Moreover, "[f]rugality in the utilization of judicial time and resources are permissible considerations in determining whether to grant a severance, so long as the danger of prejudice to the defendant is not outweighed by these considerations." State v. Lunati, 665 S.W.2d 739, 746 (Tenn. Crim. App. 1983). Had these two Defendants been tried separately, a "total duplication of the voluminous evidence" would have been required. State v. Wiseman, 643 S.W.2d 354, 362 (Tenn. Crim. App. 1982).

We conclude that the Defendants were not prejudiced by the joinder. The trial court instructed the jury that they were to consider the charges against each Defendant individually. The jury is presumed to have followed this charge. See State v. Barton, 626 S.W.2d 296, 298 (Tenn. Crim. App. 1981).

E. *Johnson's Motion to Suppress*

Johnson argues that the trial court erred in denying his motion to suppress the evidence obtained during the search of his vehicle. Specifically, he argues that the affidavit in support of the search warrant was insufficient to support the issuance of a search warrant. We disagree.

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure ... against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause." Article I, section 7 of the Tennessee Constitution similarly prohibits unreasonable searches and seizures and is identical in intent and purpose to the Fourth Amendment. A search warrant shall generally only be issued on the basis of an affidavit, sworn before a neutral and detached magistrate, which establishes probable cause for its issuance. State v. Stevens, 989 S.W.2d 290, 293 (Tenn. 1999). Because the magistrate must make a neutral and detached decision regarding the existence of probable cause, the affidavit must contain more than "mere conclusory allegations" by the affiant. Id.

"In determining the reliability of information contained in an affidavit in support of a search warrant, there is a significant distinction between a 'citizen informant,' or bystander witnesses, and 'criminal informants,' or those from a 'criminal milieu.'" Id. (quoting State v. Melson, 638 S.W.2d 342, 354 (Tenn. 1982)). The citizen informant is presumed to be more reliable. State v. Yeomans, 10 S.W.3d 293, 296 (Tenn. Crim. App. 1999). However, in order to be entitled to a presumption of reliability, the affidavit must demonstrate on its face that the informant is a concerned citizen and not a criminal informant. State v. James Norman Usery, No. 02C01-9805-CC-00154, 1999 WL 569691, at * 1 (Tenn. Crim. App., Jackson, Aug. 4, 1999). In addition, the affiant must offer more than "conclusory allegations" that the information was provided by a citizen informant. Id. at *2. In this case, the affidavit, sworn by Sergeant O. W. Stewart, merely listed the informant as a "reliable witness." Thus, the affiant failed to establish that the information contained in the affidavit came from a citizen informant.

Having concluded that the "citizen informant" standard is inapplicable in this case, we must determine whether the affidavit is sufficient under the "confidential informant" test. When the source of information for an affidavit establishing probable cause for a search warrant is a criminal informant, we must use the two-pronged *Aguilar Spinelli* test adopted by the Tennessee Supreme Court in State v. Jacumin, 778 S.W.2d 430, 436 (Tenn. 1989). Under this test, the affidavit must demonstrate (1) a basis for the informant's knowledge and (2) a basis establishing the informant's credibility or a basis establishing that the informant's information is reliable. Yeomans, 10 S.W.3d at 296.

In this case, the affidavit fails both prongs of the *Aguilar Spinelli* test. First, the affidavit fails to sufficiently establish the informant's basis of knowledge. The affiant stated that the witness indicated that Glass and Johnson had been together on the night of November 3, 1997, in Johnson's vehicle, and they were with the victim just prior to his death. Yet, the affiant never states how the witness knew this information. The affiant also fails to establish the informant's credibility or that

the information is reliable. The affiant merely states that the informant is a "reliable witness." However, this assertion alone is insufficient to establish the veracity of the informant. See Stevens, 989 S.W.2d at 295. Thus, because the affidavit supporting the search warrant on Johnson's car was insufficient, we conclude that the search of Johnson's car was illegal.

However, we find that even without the evidence procured from the car, a reasonable jury would have concluded that the Defendants were guilty of the first degree murder. The items seized from the car included the following: a .357 Magnum revolver, six live .357 rounds, a "login" handgun box, several pawnshop tickets, photos, and a piece of paper with phone numbers. Although this evidence corroborated much of the testimony at trial, the other evidence against the Defendants was substantial. Marcus Glass testified that he saw the Defendants shoot and kill the victim. Testimony by the medical examiner corroborated the manner in which Glass described the killings. Raniko Bonner testified that Glass and the two Defendants left her house together on the evening of November 3, 1997 because they "had some business to take care of," and finally, Robert Walker testified that Tony Phillips told Jefferson "take care of his business," insinuating that Jefferson was supposed to "put [the victim] to sleep."

Thus, even without the items obtained from the car, there was more than ample evidence to convict the Defendants of first degree murder. As such, we hold that the admission of the contents of Johnson's car was harmless beyond a reasonable doubt. See Tenn. R. Crim. P. 52(a).

### F. *Error Coram Nobis*

Finally, Defendant Jefferson contends the trial court erred in denying his petition for *writ of error coram nobis*. Jefferson's co-defendant, Larry Johnson, executed an affidavit post-trial alleging defendant was not involved in the murder. This statement contradicted Johnson's trial testimony, in which he claimed he knew nothing about the murder. Thus, Defendant Jefferson asserts the trial court erred in failing to grant a new trial based upon this "newly discovered evidence."

Under certain circumstances, a criminal defendant may file for a *writ of error coram nobis.* *See* Tenn. Code Ann. § 40-26-105. This remedy is available only when an unknown issue was neither able to be addressed nor addressed at trial, and may have resulted in a different judgment. *Id.*, State v. Hart, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995). When the petition addresses newly or subsequently discovered evidence, the evidence must be admissible under the rules of evidence and material to an issue raised in the petition. Hart, 911 S.W.2d at 375. However, the petition must state:
  (1)  the grounds and the nature of the newly discovered evidence;
  (2)  why the admissibility of the newly discovered evidence may have resulted in a different judgment had the evidence been admitted at the previous trial;
  (3)  the petitioner was without fault in failing to present the newly discovered evidence at the appropriate time; and
  (4)  the relief sought by the petitioner.

<u>Newsome v. State</u>, 995 S.W.2d 129, 133 (Tenn. Crim. App. 1998)(citing <u>Hart</u>, 911 S.W.2d at 374-75).  Moreover, the decision to grant or deny a petition for *writ of error coram nobis* on the ground of newly discovered evidence rests within the sound discretion of the trial court.  <u>Hart</u>, 911 S.W. 2d at 375; Tenn. Code Ann. § 40-26-105.

Jefferson's petition alleged:  (1) his attorney received an affidavit from co-defendant Johnson exculpating defendant of the murder for which he was convicted; (2) Johnson's affidavit was not received by counsel until after the trial; and (3) had this evidence been introduced at trial, it may have resulted in a different judgment.  Johnson's affidavit alleged that Johnson was present during the murder, and defendant was not involved in the murder.  The affidavit contradicted Johnson's trial testimony in which he stated he was not present at the murder and did not know anything about the murder. However, Johnson stated in his affidavit that, although he [Johnson] was present at the murder, he had no prior knowledge of it and did not participate in it.

The trial court must determine the credibility of the witnesses who testify in support of the accused's petition.  <u>Hart</u>, 911 S.W.2d at 375.  If the trial court does not believe the witnesses presented by the accused are credible, the court should deny the application. *Id.*  Additionally, our supreme court held that a petition for *writ of error coram nobis* will not be granted where the subsequently or newly discovered evidence is simply cumulative to other evidence in the record, or merely contradicts or impeaches the evidence adduced during the course of the trial, when the evidence, if introduced, would not have resulted in a different judgment. *Id.* (citing <u>Scruggs v. State</u>, 404 S.W.2d 485, 486 (Tenn. 1966); <u>Hawkins v. State</u>, 417 S.W.2d 774, 778 (Tenn. 1967)).

Here, the trial court determined that "the affidavit of Larry Johnson recanting his testimony at trial indicating he also lied to the police in his statement of November 17, 1997, fails to satisfy the Court as to believability and credibility." Johnson did not testify at the hearing.  The only evidence before the trial court was the affidavit of Johnson, whose trial testimony the jury had found lacking in credibility.  We find no reason to dispute the trial court's conclusion, and further find that the affidavit contradicts Johnson's prior testimony.  We concur in the finding by the trial court that Jefferson has not shown that the new assertions of Johnson would have changed the trial's outcome.

Therefore, under the analysis of <u>Hart</u>, defendant is not entitled to relief.  Thus, we conclude the trial court properly denied defendant's petition for *writ of error coram nobis*.

Accordingly, the judgments against the Defendants are AFFIRMED.

_____
ROBERT W. WEDEMEYER, JUDGE

-15-